The District Court erred when it imposed an upward departure of six levels based on the fact that the iodine was likely to be used to manufacture methamphetamine, when it failed to consider that fact in failing to adjust the base defense level for minor role. Let me ask you a practical question in this case. If I understand correctly from the briefing, your client is due to be released July 23rd. Is that correct or incorrect? That's correct, Your Honor. Depending on, I mean, we're not much more than a month ahead of that time at this point. Even assuming that we were to agree with you and send it back to the District Court, by the time the District Court rules, the issues would seem to be moot. What do you suggest as a practical matter, assuming for the sake of this question that we would agree with you? Well, if you agree with me in time, I could request that he be let out on bond before the District Court actually had a rehearing. And the District Court, I imagine, would likely consider that, given the short sentence that would be left. I also think that it would have an effect because Mr. Cerna was also sentenced to a term of supervised release. And certainly if the District Court shortened the amount of time, the custodial sentence, then it would then have to shorten the amount of time that, or rather, it would affect the end time for the supervised release or the end of the supervised release term. So it would have an effect on his sentence either way. But practically, we could ask for a bond immediately from the District Court. Okay, thank you. The District Court, it applied a six-level upward departure in this case. And though one is contemplated by the guidelines themselves by 2T3.1, here the District Court based its assessment on risk. It was focused on risk. And the extent of the departure was unreasonable when viewed against the other guideline sections that provide enhancements for risk, where there is actual harm. There are various guidelines that provide enhancements of four levels, of two levels. And even the drug guidelines themselves in 2D1.1B5C, which has an enhancement for risk of harm, what they do there is they provide for an enhancement for risk of harm where there's actual production of methamphetamine. So they, A, don't assume that the actual production of methamphetamine causes harm, and it's in the conjunctive. So even there, where there's the actual production of methamphetamine and a substantial risk of harm, the enhancement is only of three levels. So even an enhancement that would arguably be much more appropriate is considerably lower in this case, only three levels. So the extent of the departure was also unreasonable. And the District Court found that your client knew that the iodine was going to be used to make methamphetamine. No. Did he not find that? He did not find that. In fact, he found the opposite, that the government hadn't been able to prove. I thought he found it by a preponderance of the evidence rather than by clear and convincing evidence. Am I mixing this one up with the other iodine case? That's certainly possible. No, actually, I don't have the sign in front of me. I actually think that you are correct about that. Okay. And would that finding by a preponderance of the evidence, wouldn't that support an upward departure? And is that not a proper basis for the departure? Well, I think the fact that the District Court found that it was by preponderance, that the government had proved it by preponderance, but not by clear and convincing. That meant he didn't get a 20-level increase. Correct. Okay. And he didn't. He didn't. He got a 6-level. Correct. So you have not challenged that finding as being not supported, have you? I'm sorry. Was there evidence from which the District Court could find by a preponderance of the evidence that he knew that this was going to be used to produce the meth? I don't think that it was proved by preponderance. There was some evidence. It was what Mr. Scherna had said to the agent at the time of fingerprinting, that when the agent informed him that iodine was used in the manufacture of methamphetamine, Mr. Scherna says, I know. That provides evidence for the District Court's finding by a preponderance of the evidence. But I think that the, although this wasn't raised in the brief, I do think that it would have to be by clear and convincing evidence. Here, a 6-level upward enhancement is a very large enhancement. And even in an adjustment which is provided for by in the guidelines themselves where there's a 6-level increase, the standard has to be by clear and convincing evidence. And certainly when the judge is using his discretion to increase it by 6 levels, given the guidelines approach where they want certainty in sentencing, I think that it would probably have to be clear and convincing. This isn't something that I raised in my briefs. But certainly there wasn't enough evidence here that he knew, at least not by clear and convincing standard, that he knew that the iodine was either going to be used to make methamphetamine or likely, reasonably likely to be used. But even when he said, I know? Right. When the agent said. What the District Court found was that in the context in which it was said, that the context of it was important here. Mr. Suna had been interviewed by the agents, and he had talked about the fact that his girlfriend was also present and was trying to exonerate her. And what the District Court found was that at that time, he was obviously trying to help the agents because obviously he didn't want to get in trouble. At the time that he was being fingerprinted, he was trying to be cooperative, trying to help the agents. So it was in the context of trying to say something to them that would help him get out of trouble. But it wasn't truthful. Well, what it found was that it didn't have enough reliability for the District Court to find that it was proven by clear and convincing. That given the context of what was said, that it wasn't reliable enough to believe it to its fullest. And what the District Court did is even though it clearly gave an upward departure because of the fact that item was going to be used to make methamphetamine, it failed to give a mitigated role adjustment. And what it did is it compared Mr. Suna's participation in this offense of relative culpability to other violators of other regulations and not to the other people that were involved in this particular criminal scheme. And that's an approach that's been rejected by the Court in Rojas Millan and Demers and in Webster. But here the District Court also said that Suna was no less culpable than other defendants convicted of this regulatory smuggling offense. This sounds to me a lot like the example given in 3B1.2, no, 3B. Well, the example in 3B1.2, it applies in very particular circumstances. And it was discussed by this Court in Demers. And what this Court said, and this is a quote, is that that provision of the commentary only applies where the District Court determines as a factual matter that the defendant has benefited by virtue of the relative seriousness of his offense of conviction compared to his actual criminal conduct. And here his actual criminal conduct was not that relative or comparable to one under the Drug Guidelines or under the Controlled Substances Act. The government actually – I don't understand that. What are you trying to – Well, I think that – Can you say that again? Note 3 in 3B1.2 only applies where someone is convicted of something that is substantially less serious than what their actual conduct warrants. Here the government – Well, isn't that exactly, though, what the judge found here, was that his conduct was very serious because he knew that this was going to be used to make meth. It was a dangerous process to happen, that he was well aware that he was bringing in something illegal that was going to harm people. He actually made a contrary finding to that, because the government didn't charge any offense under the Controlled Substances Act. They only charged the 545. But then they tried to prove at sentencing that his men's rail was commensurate with that of an offense under the Controlled Substances Act. And they weren't able to do that even by the reduced standard of clear and convincing. So the District Court actually found that the government had not proved that he was guilty of an offense greater than that. All right. That takes us back, though, to the previous discussion we had, which is that he found it by preponderance of the evidence rather than clear and convincing, which was very much to your client's advantage in getting a 6-level increase instead of a 20-level increase, as I understand it. But as a factual matter, as required by Demers, the District Court didn't find that his – that the offense of conviction was substantially less serious than that which was warranted by his actual criminal conduct. And so I think that this is not the type of case that Demers refers to. In discussing relevant conduct, Demers also talks about the fact that when the base offense level is set, that the relevant conduct that's used in determining the base offense level does not limit the relevant conduct that's used in determining whether a mitigated role adjustment applies. And here, within the larger drug trafficking scheme, Mr. Cerna was just someone who went to Mexico, called someone, somebody else loaded the iodine in his car, and then he was to call somebody else. And clearly, the District Court, having been in a position where he sees these types of cases very often, believes that those particular circumstances warranted a mitigated role adjustment, one of three levels, compared to the other actors in his particular scheme, which is the – the – The regulatory offense, right? Well, no. He was convicted of the regulatory offense. Right. He was sentenced for the regulatory offense. But in Demers, what the court – what this Court held was that – I want to focus on your argument with regard to the role adjustment here. The court said he didn't think that your client played a minor role in the specific violation involved here. And so I guess what I'm not sure of is what's wrong with that analysis. Because it's not the analysis that was used in Rojas Millan or in Demers. What this Court has held is that you can't just limit – when determining a role adjustment, you can't just limit the relevant conduct to the – the offense of conviction. And in Demers, it involved a conspiracy case with drug trafficking, and he was only convicted of possession with intent to distribute, and only held responsible in setting the base offense level for those drugs that he, in his particular circumstance, was involved, and not that involved in the larger conspiracy. And what this Court held is that – that the fact that the relevant conduct in determining the base offense level was that using just the drugs in his case, that that didn't limit this Court in looking outside of that. Well, it's – it strikes me that your arguments are sort of at cross-purposes. When you're looking at minor role adjustment, you want us to look at this as a part of a giant methamphetamine operation so that we consider him a small player. But when you look at – you want us to look at the adjustment upward, you don't want us to think about it as a giant methamphetamine operation because he was really only bringing in iodine, and it should be looked at as just a little iodine. So it seems to me that those arguments are inconsistent. Can you help me with that? Well, I would say that they're not inconsistent given the way that the guidelines are set out. 2T3.1 only directs the court to – the district court to use another guideline section if it's more appropriate, and it wasn't here. But that doesn't mean that the district court isn't supposed to look at the mitigated role adjustment. In fact, it has to look at the mitigated role adjustment, whether it applies or not. And I think that the district court also wanted to have it both ways. Indeed, they didn't want to consider the fact that the iodine was going to be used to manufacture methamphetamine in setting the base – or in the role adjustment, but then ultimately did consider it. And so given that fact, the fact that those – what it did is it took an inconsistent approach to both of those things. Both of them can't be right. And because it did consider the fact that iodine was going to be used in giving it up for departure, then it should have considered it and whether there was going to be a role adjustment. And I see that I'm – I have about a minute left, so I'd like to reserve. You may do so. Good morning. May it please the Court, my name is Elizabeth Olson. I represent the United States. It might be helpful to put this in terms of relevant conduct, because in effect what the district court judge did in looking at the defendant's role with respect to this broader methamphetamine production scheme is to consider whether that broader methamphetamine production scheme should be considered relevant conduct as to this defendant. Because under 1B1.3, relevant conduct is defined, and then that definition of relevant conduct is used for purposes of application of cross-references and application of role adjustments. And so the district court judge decided what the relevant conduct was in deciding whether the cross-reference in 2T3.1c should apply, and also in considering whether a role adjustment can apply. Now, at the district court, the government lost on that question. I mean, we argued that the defendant knew he was bringing in iodine, that he knew iodine was used to make methamphetamine, that he'd been to the house where they broke the tires down and took out the methamphetamine, and that we'd established that by clear and convincing evidence. And he got you to peel on that, as I recall. He did, actually. He did, which is a little bit what got us to this point. Because the defendant, conversely, was saying that he had no idea what was in the tire, he had no idea that iodine was used to make methamphetamine, or that this was going to be used to make methamphetamine, that he had no knowledge of that criminal enterprise. Now, under the definition of relevant conduct, relevant conduct includes the acts and omissions of others that is in furtherance of a jointly undertaken criminal activity. And so, in effect, what the defendant was arguing was that the methamphetamine production scheme was not jointly undertaken criminal activity because the defendant didn't know anything about it. And although the district court judge, frankly, didn't believe him, he had decided that because of the extent of, you know, because of the effect that that would have, the standard was going to be clear and convincing evidence, and the government hadn't proven it. And he said, if the tests were preponderance, then this would go in the government's favor, but I think the test is clear and convincing evidence, and the government hasn't proven it, so I'm just not going to take that into account. And so the district court judge refused to apply the cross-reference, which would have taken him to a base offense of 28, I think, and stayed at 4, and then there was an obstruction of justice enhancement, and then the upward adjustment. But because the district court did anticipate a government appeal on that question, he said, well, for the sake of efficiency, because the government might appeal, and it might come back to me that I should have taken the whole scheme as relevant conduct. I'm going to go ahead and say what my sentence would have been if the relevant conduct actually included the whole methamphetamine production scheme. And if it did, I'd start with a base offense level of 28, and I'd give a minor role adjustment, because as a courier in this big scheme, that's a minor role. But I'm not going to do that. You're saying that was just sort of an even if, so everybody knows what would have happened. Exactly, and he said that. He said if the government appeals, and I get reversed, and I come back, it's going to be a year from now, and my memory is going to be hazy, and so let me just get this down now so that everybody will know what the result would be if, in fact, the whole methamphetamine production scheme was relevant conduct. But that's not what it is. It hasn't been proven. I'm only looking at bringing merchandise into the country contrary to law, which is a base level of 4. He's the one who did it. It's a regulatory offense. There's no role adjustment to be had here, and so I'm starting with a base offense level of 4. Now, the defendant had testified at sentencing, and the district court found that the defendant lied in that testimony, and so he imposed a two-level upward adjustment for obstruction of justice, and he refused the acceptance of responsibility departure. And then he looked at 2T3.1, which, as you heard earlier this morning, is especially designed for the loss of duties of tax. It's a tax revenue guideline with this very low base level of 4, and the guideline itself in Application Note 2 specifically contemplates that where the harm to society isn't adequately taken into account by the duties evaded, where, for example, what's being brought in is harmful or is restricted for non-economic reasons, then an upward adjustment would be appropriate so that it does adequately take into account the actual harm that's caused by what's being brought in. And that's where the district court looked and imposed a six-level upward adjustment. Now, in doing that, the court did see his reasoning in making that particular adjustment, and is that reasoning appropriate? The adjustment itself or the extent. I think what he did, the extent he looked at, he analogized, and he analogized to other places in the guidelines. He found some himself. The government suggested some appropriate analogies, and the defense suggested some appropriate analogies. And I think there is, they are, the analogies that the government proposed and the analogies that the defense proposed were different in kind. And the one that the district court used was alien smuggling, which starts at an offense level of 12, but there's an eight-level increase if, or I'm sorry, a six-level increase if the smuggling,  The government suggested several others, mishandling of environmental pollutants, which starts at a level six, but there's an 11-level increase if the conduct creates a substantial risk of harm. And he found the substantial risk of harm in the danger of meth manufacture? In the nature of, he actually did that two ways, too, because he looked at what, in fact, was being brought in, which was iodine, which is going to be used to make methamphetamine. I mean, it's a harmful thing, so he did that. But then he also said that the defendant asserted that what he thought he was bringing in was steroids or illegal medicines of some kind. I mean, this is what the defendant's story was, that he thought that what he was bringing in was steroids or illegal medicines. And so what the district court found, or what the district court said, is whether you look at what the defendant actually brought in or what he says he thought he was bringing in, either way this upward adjustment would be appropriate because either way we've got harm. You've got the actus reus and the mens rea, and the fact that the mistake of fact that he was, if you buy his story, that he was, in fact, bringing in a different dangerous thing than the dangerous thing he thought he was bringing in. But didn't the district court rely upon sort of the abstract dangerousness of methamphetamine, iodine, and chemicals that have not been approved by the FDA? Isn't that what the district court did? The district court did make, I mean, he did base that upward adjustment on a determination that iodine, which in fact is itself a caustic, I mean, when the bag and the tire broke they did have to bring in a hazmat team because apparently there can be iodine contamination, and I don't know, they didn't get very far into that, but I believe in that kind of weight, in that kind of form, iodine itself can be dangerous to some extent. But in fact, no, he was relying on the fact that iodine is a precursor chemical that is used to manufacture methamphetamine, and to the extent that he simply relied on his own common sense that methamphetamine is a dangerous substance, I don't know how much more would have been necessary for that. What bothered me was his analogy to the importation or smuggling of illegal aliens. Oh, well, I think what he was doing, and this is where I want to go back to what the analogies that the defense proposed in terms of the extent of the departure were things where if there's an actual risk of harm there's just a two-level increase or up to a four-level increase. But I think the difference between those two sets of guidelines that we were each suggesting as analogies is that in the guidelines that the defense was suggesting, the risk of harm was already inherent. So, for example, assault with intent to murder is one of the guidelines that the defense pointed to where the base offense level is 28, and if there's actual harm, you go up another two or another four, depending on how serious the harm is. But in that case, the base offense level is so high, it's already 28, because the risk of harm is inherent in the offense itself. And the other one said they looked at aggravated assault. Criminal sexual abuse starts at 27, goes up two. But in all of those cases, the base offense level is so high, and I think in part because in those offenses there's already such an inherent risk of substantial harm. Whereas in the alien smuggling, the base offense level is 12. Although risk of harm is common in alien smuggling, it's not necessarily inherent in the act of alien smuggling, but where the way that it's done creates a substantial risk. You know, then you go up six. And I think that this case is another case where bringing merchandise into the country contrary to law, there isn't an inherent risk of harm in that offense. Because you could have a bag of limes or something. You know, or a couple bottles of tequila or whatever it is that you're bringing, souvenirs or, you know, what have you. But where what is actually going on is something that creates a substantial risk of harm, then that warrants a significant increase. And I think that if you even just look at the base offense levels of the offenses that have within them an inherent risk of harm, you'll see that those are very high. I mean, you've got, you know, criminal sexual abuse is 27. Kidnapping is 32. Aircraft piracy starts at 38. And then if there's actual harm, you know, it ticks up a little bit beyond that. I have a procedural question. Yes. Under the PROTECT Act, and, of course, the statutes with nice names are so interesting, and, of course, this doesn't involve exploitation of children today at all, but something far different. It's the de novo review of upward or downward departures. What does de novo review mean? Does that mean that we have to decide it really new? But does that mean we, as a court of appeals, can make the decision and simply state whether it was an appropriate departure or not, and if it was not, find some other method, or do we have to remand it to the district court for that activity? Well, my understanding of the PROTECT Act is that the decision to depart is reviewed by this court de novo. So this court can look fresh at whether or not the district court was right to depart. But before or after the PROTECT Act, once this court has decided that it was appropriate for the district court to depart, the extent of the departure is still reviewed for abuse of discretion. That's my understanding of the PROTECT Act. And the Ninth Circuit case there is United States v. Alfaro, which I cited on page 21 of my brief. So I think the question that this court is looking at de novo is whether an adjustment, an upward departure, was appropriate. And in this case, I think it clearly is, both because the guidelines themselves contemplate the upward departure. And frankly, in the defendant's reply brief and the supplemental appendix that they submitted, a copy of their sentencing memorandum, you'll see that the defendant had actually suggested an upward departure as a way, as they were arguing that it shouldn't be the drug guideline with the level 28, it should just be the regulatory offense. And then there's several footnotes that they say, of course, you know, what the court can do is go with that and then do an upward departure. So I don't think that there's – so on the question that this court is reviewing de novo, I think that it's fairly clear, based on the facts and based on the guidelines themselves, that the upward adjustment is appropriate. And then the extent of the adjustment, what you're looking for, is abuse of discretion. Well, my question was prompted by the fact that by – the release dates July 23 of 2004. Yes. And if we should decide there should be a remand, there's not much time to do anything about that. That's true. That's true. And I don't really know procedurally how that gets handled. I know that, you know, the briefing on this was done some time ago, but it was a very short sentence. I mean, it was a 16-month sentence. So no matter how quickly everything happened, I think we were – There would be something significant about it, though, if you came all the way out from Washington, D.C. to argue it. Resource issues is, I think, what happened there. The other point that I – let's see. The extent – the upward departure – oh, the other point that I just wanted to respond to very briefly is this idea that in doing the upward departure, the judge was relying on the same thing that he refused to consider in the role adjustment. And I think that that's just not the case. I think that in deciding what the relevant conduct was, which is what determined whether a role adjustment was appropriate, the judge was really looking at the defendant's knowledge of the broader methamphetamine production scheme and had decided that the defendant didn't have the knowledge of the scheme. In deciding on the upward departure, what the application note says is that where what is being brought in is harmful, an upward adjustment, an upward departure is appropriate. And so there is a question of what, if any, knowledge does the person have to have about whether what they're bringing in is dangerous. And what I was thinking this morning is if someone brings something across the border and has no idea what it is – I mean, they're given a package, and they bring it across, and they have no idea what it is, and it turns out that what they're bringing is dangerous, would that upward – would an upward departure be warranted? And I would argue yes. In this case, we don't have to get there, because in this case, the defendant admitted that he believed that what he was bringing across was illegal medicines or steroids. So in this case, you can say that the defendant may have been mistaken, in fact, about which dangerous thing he was bringing over, but there wasn't any question as to his knowledge that he was bringing over something dangerous. But given the application note, I'm not even sure that that would have been necessary, because I don't think that someone who brings something over the border having no idea what it is they're bringing in should be excused from the penalty if what, in fact, they're bringing in is something that's harmful or dangerous. Thank you, counsel. Your time has expired. Ms. Aguilar, I believe you do have some rebuttal time remaining. The government – what it does in its briefing, what it did here, is that it said that we urge the district court to limit the relevant conduct just to the regulatory offense. That's not what was done. What we argued at the district court was that 2T3.1, as set forth in Appendix A, was the appropriate guideline section to use, and that only where the cross-reference was applicable could the district court go outside that guideline to 2T3.1. Suppose we disagree with you that that's the – that there's no cross-reference. What is your best backup argument if that cross-reference does apply? If the cross-reference does apply, contrary to your argument. You've said don't cross-reference, just stay with that guideline. Well, the district court found that the 2T3.1 was applicable in this case because the government didn't have – hadn't proved that he had reasonable possibilities. Oh, okay. I see what you're saying. So that's what my argument was. And what this court held in Demers is that, and this is a quote, we declined to restrict the scope of relevant conduct on which a downward adjustment may be based to the relevant conduct that is included in the defendant's base offense level. And so the conduct that's used to set the base offense level is not necessarily that conduct that the district court of this court needs to use in determining whether there's a role adjustment, whether one is warranted. And here the district court found that one was warranted in the larger scheme familiar with these types of cases. And knowing, having been through the trial, having seen everybody testify, he found that in the larger methamphetamine production scheme, his role was mitigated. And it did consider the fact that iodine was going to be used to make methamphetamine. And sentencing him, ultimately, he used it in the upward departure. So given that he actually considered it, it was inconsistent for it not to have given a minor role adjustment. Thank you, counsel. Thank you. The case just argued is submitted. And we will stand adjourned for the morning session.
judges: Gibson , D.W. Nelson, Graber